RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0316p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RONALD R. HARRIES,

        *Petitioner-Appellee/*
        *Cross-Appellant,*

      *v.*

RICKY BELL, Warden,

        *Respondent-Appellant/*
        *Cross-Appellee.*

Nos. 02-6286/6334

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 84-00579—John T. Nixon, District Judge.

Argued: December 8, 2004

Decided and Filed: July 28, 2005

Before: BOGGS, Chief Judge; GIBBONS and COOK, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. William P. Redick, Jr., Whites Creek, Tennessee, Peter D. Heil, Nashville, Tennessee, for Appellee. **ON BRIEF:** Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. William P. Redick, Jr., Whites Creek, Tennessee, Peter D. Heil, Nashville, Tennessee, Christopher M. Minton, FEDERAL PUBLIC DEFENDER's OFFICE, Nashville, Tennessee, for Appellee.

_____

### OPINION

_____

COOK, Circuit Judge. Ricky Bell, Warden for the State of Tennessee, appeals the district court's order granting Ronald R. Harries a writ of habeas corpus as to the penalty phase of his trial, thereby vacating his death sentence. Harries cross-appeals from the district court's denial of habeas corpus as to the guilt phase. We affirm the district court's order granting the writ with respect to the sentence and denying the writ with respect to the conviction.

## I.  BACKGROUND

Harries shot and killed Rhonda Greene, a convenience-store clerk, during an armed robbery, and a Tennessee jury convicted him of first-degree murder in 1981. Finding two statutory aggravating circumstances—prior conviction of a felony involving the use or threat of violence and felony-murder—the jury recommended the death sentence.  The trial court sentenced Harries to death, and the Tennessee Supreme Court affirmed.  A petition for a writ of habeas corpus was filed on Harries's behalf in 1984, but habeas proceedings were stayed while Harries pursued post-conviction relief in Tennessee state courts.

Harries filed his first petition for state post-conviction relief in 1986 alleging ineffective assistance of counsel and other constitutional errors.  The trial court conducted an evidentiary hearing and denied relief on all claims.  The Tennessee Court of Criminal Appeals affirmed.  Harries filed a second petition in 1993, challenging the application of the felony-murder aggravating circumstance, and the trial court again denied relief.  The Court of Criminal Appeals found the use of the felony-murder aggravating circumstance invalid under state law but held the application of that aggravating factor harmless error.

In 1999 Harries amended his stayed habeas petition.  Following an evidentiary hearing, the district court found Harries's prosecutorial misconduct and ineffective-assistance-of-counsel claims warranted granting the writ with respect to the penalty phase of his trial.  The court denied the writ as to all other claims.

## II.  STANDARD OF REVIEW

Because Harries filed his habeas corpus petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, we apply the pre-AEDPA standard of review.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  That standard entitles Harries to have the federal habeas court "'make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings.'"  *Buell v. Mitchell*, 274 F.3d 337, 344 (6th Cir. 2001) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).  A district court may grant the writ if the state-court conviction violated the Constitution, laws, or treaties of the United States.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

This court reviews district courts' dispositions of habeas petitions de novo and findings of fact for clear error.  *Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997).  Questions of law or mixed questions of law and fact are reviewed de novo.  *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  We assume the correctness of state courts' factual findings unless convincing contrary evidence exists.  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *overruled on other grounds by Abdur'Rahman v. Bell* (*In re Abdur'Rahman*), 392 F.3d 174 (6th Cir. 2004).

## III.  EVIDENTIARY HEARING

Warden Bell relies on this court's holding in *Mitchell v. Rees* for his claim that the district court should not have held an evidentiary hearing.  In *Mitchell*, we held: "Because § 2254(d) is an express limitation on the district court's jurisdiction, a district court is without authority to hold an evidentiary hearing on a matter on which the state court has made findings unless one of the factors contained in § 2254(d) applies."  114 F.3d 571, 577 (6th Cir. 1997).  But, as we recognized in *Abdur'Rahman v. Bell*,  *Mitchell* conflicts with Sixth Circuit and Supreme Court precedent. 226 F.3d 696, 705–06 (6th Cir. 2000) (citing *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir. 1992)).  "Thus, it seems that despite the holding in *Mitchell*, a district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent."  *Id*. at 705.  The district court did not err when it held an evidentiary hearing.

## IV.  COMPETENCE AT TRIAL

A defendant's competence is a question of fact, which we review for clear error.  *See Thompson v. Keohane*, 516 U.S. 99, 111 (1995).  A defendant is mentally incompetent to stand trial if he lacks a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam).  The state trial court did not hold a full hearing on Harries's competency, so the district court did not defer to any prior determination of competency.  The district court found that "at the time of the trial Petitioner was suffering from Bipolar Disorder and Anxiety Disorder, impairments which may have been exacerbated by a pre-existing organic brain damage, his drug use, his unstable childhood, and the pre-trial conditions of confinement in Sullivan County."  (Slip op. at 71.)  The district court nevertheless found Harries competent, accepting explanations for his seemingly bizarre behavior that made such behavior appear rational.

Harries alleges that his behavior at and around the time of trial was so bizarre that it shows his incompetence to stand trial.  His behavior included:  (1) demanding that Tennessee seek the death penalty before waiving extradition from Florida; (2) talking with the press; (3) testifying at his co-defendant's trial and threatening the prosecutor at that trial; (4) refusing to seek a change of venue; (5) behaving irrationally in jail by staging hunger strikes, throwing food, fighting, attempting to defraud guards, and cursing at guards.

The district court explained why Harries's conduct failed to prove his incompetence during trial:  (1) Harries demanded that Tennessee seek the death penalty only at the time of extradition; (2) Harries talked with the press to create a favorable impression of himself in the community and to ensure his safety in prison by having the press visit him there; (3) Harries testified at his codefendant's trial out of "convict loyalty"; (4) Harries rejected a change of venue because he did not want to be in a smaller community where the jurors would likely be more conservative, and he would not have access to the press; and (5) Harries believed he could manipulate the situation to his advantage through his jailhouse behavior.  Further, a review of the trial transcript indicates that Harries behaved appropriately throughout the trial, except for saying "damn" once outside the jury's hearing.

The district court's determination coincides with the conclusions of both doctors who examined Harries before trial and Harries's trial counsel himself.  Before trial, court-appointed doctors twice evaluated Harries to be competent to stand trial.  Harries's trial counsel bolstered the competency evidence with his personal confirmation of his ability to communicate with Harries.

The contrary opinions offered by Harries's experts at the evidentiary hearing lack the same relevance—both of those evaluations occurred well after trial.[1]  Dr. Lewis first evaluated Harries in 1984, three years after trial.  Dr. Woods submitted his report in October 2000, nineteen years post-trial.  *See Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1259 (11th Cir. 2002) (noting that "incompetency to stand trial seven and eight months later [than trial] . . . is relevant, but it is not enough to counter the best evidence of what his mental condition was at the only time that counts, which is the time of trial").  Also diminishing the relevance of Doctors Lewis's and Woods's opinions is their perspective—each had the benefit of hindsight when evaluating Harries's allegedly irrational behavior.  As the district court noted:  "Petitioner's experts (in particular Dr. Lewis) tend to look back at decisions that turned out badly for Harries and label them as irrational based on their ultimate outcome."  (Slip op. at 74.)  When measured against the pretrial assessments, the opinions

---

[1] The state also presented two experts who evaluated Harries and reviewed his past medical history.  They concluded that Harries was competent to stand trial.

of Harries's experts fail to counter the evidence in the record that suggests Harries had a "sufficient present ability to consult with his attorney" at the time of trial.  *See Dusky*, 362 U.S. at 402.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

### A.  *Strickland* Standard

Because an ineffective assistance of counsel claim involves mixed questions of law and fact, we review the district court's disposition of the claim de novo and its findings of fact for clear error. *Mapes v. Tate*, 388 F.3d 187, 190 (6th Cir. 2004).

To prevail on an ineffective-assistance-of-counsel claim, a petitioner must satisfy both prongs of the *Strickland* test:  performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984).  To satisfy the performance prong, a petitioner must prove that his attorney's representation "fell below an objective standard of reasonableness."  *Id.* at 688.  To satisfy the prejudice prong, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  When a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.* at 695.

### B.  Ineffective Assistance of Counsel During Guilt Phase

Harries contends that his attorneys were ineffective during the guilt phase of his trial because they failed to argue that he was incompetent to stand trial.  But we have already concluded that the district court did not clearly err when it found Harries competent during his trial.  Thus, Harries's ineffective guilt-phase assistance claim must fail because he cannot show prejudice resulting from his attorneys' allegedly deficient performance.

### C.  Ineffective Assistance of Counsel During Sentencing Phase

Harries also maintains that he received ineffective assistance of counsel during the sentencing phase because his attorneys failed to investigate and, consequently, present mitigating evidence.  The district court agreed.

#### 1.  Performance

To evaluate counsel's performance, we "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  *Strickland* mandates that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and make every effort "to eliminate the distorting effects of hindsight."  *Id*. at 689.

Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is "well-established." *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997).  The "prospect of being put to death unless counsel obtains and presents *something* in mitigation" magnifies counsel's responsibility to investigate. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).  And notwithstanding the deference *Strickland* requires, neither this court nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 523–28 (2003) (concluding that counsel's failure to expand their investigation of the defendant's personal background, which included physical and sexual abuse, beyond the presentence

investigation and Department of Social Services reports constituted constitutionally deficient performance); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding counsel's failure "to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood" deficient); *Carter v. Bell*, 218 F.3d 581, 596–97 (6th Cir. 2000) (concluding that defense counsel's failure to investigate the defendant's family, social, or psychological background "constituted representation at a level below an objective standard of reasonableness").

Accordingly, "our principal concern in deciding whether [counsel] exercised reasonable professional judgment is . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Harries's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 522–23 (internal quotations and citations omitted). "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id.* at 523 (quoting *Strickland,* 466 U.S. at 688). The Tennessee Supreme Court established the standard for defense counsel in *Baxter v. Rose*, 523 S.W. 2d 930, 936 (Tenn. 1975), where it stated that competence would be measured by the "duties and criteria" set forth in *United States v. DeCoster*, 487 F.2d 1197 (D.C. Cir. 1973), the Sixth Circuit standard in *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974), and the American Bar Association Standards for the Administration of Criminal Justice. More recent ABA Guidelines, which the United States Supreme Court has recognized as reflecting prevailing professional norms, emphasize that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases §11.4.1 (C), p. 93 (1989) and adding emphasis).

Guided by the binding precedent just discussed, we cannot escape the conclusion that Harries's counsel failed to conduct a constitutionally adequate investigation. Counsel limited their investigation to contacting by telephone Harries's mother and brother, sending requests for information to some of the institutions in which Harries had been confined, and interviewing Harries, Harries's codefendant, and two state witnesses. Although counsel requested two court-ordered competency evaluations, they declined to seek the assistance of a mental health expert or conduct a thorough investigation of Harries's mental health, even after Harries's mother alerted them that Harries suffered from mental illness. Nor did counsel adequately investigate Harries's family background, despite indications of Harries's troubled childhood.

Attempting to defend their failure to investigate and present this mitigating evidence, Harries's counsel pointed to Harries's instructions that they not pursue mental illness as a defense and their belief that evidence of Harries's background would not persuade the jury**.** But our prior decisions foreclose such arguments here. In *Coleman v. Mitchell*, we reiterated that "defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate." 268 F.3d at 449-50. We cited our prior decision in *Carter v. Bell*, in which we emphasized: "The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Id.* at 450 (quoting *Carter*, 218 F.3d at 596). In *Austin v. Bell*, we rejected counsel's argument that he "did not present any mitigating evidence because he did not think that it would do any good," concluding that such reasoning "d[id] not reflect a strategic decision, but rather an abdication of advocacy" given the availability of witnesses willing to testify on the defendant's behalf. 126 F.3d at 849.

The Supreme Court's recent decision in *Rompilla v. Beard*, 125 S. Ct. 2456 (2005) reconciles easily with these prior holdings. Defense counsel in *Rompilla*, like Harries's counsel here, abandoned their search after interviewing the defendant and a few family members (in addition to three mental health witnesses) without developing any useful mitigation evidence. *Id*. at 2462-63.

In dicta, the *Rompilla* Court noted that "there [was] room for debate about trial counsel's obligation to follow" other leads, as counsel may have had good reason to think further investigation would have been fruitless. *Id.* But interviews conducted by Harries's counsel, unlike *Rompilla*, produced viable leads regarding Harries's poor mental health and troubled family background. Counsel's failure to follow these promising leads leaves no "room for debate" that their truncated investigation was deficient.

We thus conclude that "[c]ounsel failed to conduct a constitutionally adequate pretrial investigation into potential mitigation evidence which, in turn, hampered [their] ability to make strategic choices regarding the penalty phase proceedings." *Coleman*, 268 F.3d at 447 n.15 (internal citation, quotation marks, and alterations omitted).

2. Prejudice

For counsel's objectively unreasonable performance to constitute ineffective assistance of counsel, *Strickland* requires a petitioner to prove prejudice "satisfied by showing a reasonable probability that but for such performance the trial outcome would have been different." *Id.* at 452. Harries thus bears the burden of showing a "probability sufficient to undermine confidence in the outcome," but need not prove that "counsel's unreasonable performance more likely than not altered the outcome in the case." *Id.* (internal quotation marks omitted). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Here, had counsel conducted an adequate investigation, they would have discovered evidence of Harries's traumatic childhood, including the significant physical abuse Harries suffered at the hands of his mother, stepfather, and grandmother. At least once, Harries's grandmother hit him on the head with a frying pan. When Harries was eleven, he was choked so severely that his eyes hemorrhaged. Harries's family members blame Harries's stepfather for this incident. A year later, staff at the Cuyahoga County Detention Home found multiple traumatic scars on Harries's scalp.

And Harries's exposure to violence extended beyond his own abuse. Harries's father and stepfather beat his mother, and his stepfather raped his sister. Both Harries's father and stepfather were ultimately murdered themselves.

Other evidence of Harries's troubled background abounds. Since age eleven, Harries has spent all but a combined total of 36 months confined in institutions, some of which were violent or unsanitary. Harries's injuries as a child and young adult include falling out of a moving car when he was three or four and sustaining many blows to the head during fights. When Harries was twenty, he attempted suicide and suffered carbon monoxide poisoning.

In addition to this background evidence, adequate investigation would have revealed that Harries has suffered damage to the frontal lobe of his brain, the existence of which experts for both Harries and Bell recognize. Frontal-lobe damage can result from head injuries and can interfere with a person's judgment and decrease a person's ability to control impulses.

Finally, had counsel completed a thorough investigation, they would have learned of Harries's mental illness. Experts agree that Harries suffers from a mental disorder, though they disagree about its nature. Among Harries's various conflicting diagnoses are: bipolar mood disorder, trauma-induced anxiety, anxiety disorder not otherwise specified, post-traumatic stress disorder, and antisocial personality disorder.

"This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury. . . ." *Rompilla*, 125 S. Ct. at 2469 (finding prejudice due to failure to present mitigating evidence including evidence of abusive childhood, mental problems,

and history of incarceration).  It is possible, of course, that a jury could have heard the evidence described above, and still have decided on the death penalty, but, as the Supreme Court noted in *Rompilla*, that is not the appropriate test.  *See id.*  Instead, we must ask whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Harries's] culpability."  *Wiggins*, 539 U.S. at 538 (internal citation and quotation marks omitted).  We hold that the likelihood that the mitigating evidence available in this case would have influenced the jury is "sufficient to undermine confidence in the outcome" reached at Harries's sentencing.  *See Strickland*, 466 U.S. at 694.

Warden Bell insists Harries suffered no prejudice from his attorneys' failure to discover and present this powerful mitigating evidence, because presentation of that evidence would have opened the door to additional adverse evidence of Harries's criminal background.  Specifically, Bell argues the prosecutor would have countered the additional mitigating evidence by informing the jury that Harries:  became involved in the juvenile offender system due to theft and alcohol use; was sent to a home for troubled youth because of a number of additional thefts and runaways; was arrested as a juvenile for breaking into and robbing the Cleveland Union Terminal while possessing a four-inch pocket knife; was arrested for an armed robbery of a gas station and received an undesirable discharge from the Marine Corps; has participated in scams to hustle money; and has admitted to other armed robberies and to shooting a man he believed was having an affair with his wife.

We find Bell's argument unpersuasive for two reasons.  First, Tennessee law would bar admission of the additional adverse evidence.  Second, even assuming the evidence's admissibility, the balance of aggravating and mitigating factors still favors finding prejudice.

Under Tennessee law, "evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant."  *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn. 1979).  The Tennessee Supreme Court's decision in *Cozzolino* "requires the State to show that its negative evidence was relevant to a mitigating factor actually presented."  *Carter*, 218 F.3d at 598 (emphasis omitted).  Applying this rule, the court in *Cozzolino* ruled inadmissible evidence of the defendant's "present criminal proclivities," finding that such evidence did not "explain or controvert" the defendant's "attempt to show the origin, in a troubled childhood, of the defendant's criminal acts."  584 S.W.2d at 768.  Similarly, in *Carter*, we interpreted *Cozzolino* as dictating the inadmissibility of evidence of the defendant's criminal history, as it did not controvert "evidence of specific non-statutory mitigating factors such as . . . family history, limited education, low and declining IQ, mental condition."  218 F.3d at 599.

We find the State's evidence here indistinguishable from that at issue in *Cozzolino* and *Carter*.  Here, as in *Cozzolino* and *Carter*, Harries's mitigation evidence would have disclosed the origin of his criminal acts.  The additional adverse evidence Bell identifies as having been available to counter the mitigation (so as to foreclose the *Strickland* prejudice prong) would not have explained or controverted the existence of Harries's tragic childhood, mental illness, or brain damage, or the nexus between these factors and his criminal behavior.  Accordingly, under Tennessee law, the State could not have presented such evidence to the jury to counter Harries's mitigating evidence.

Moreover, even assuming the admissibility of the additional adverse evidence, we find that the Supreme Court's decision in *Williams v. Taylor* mandates finding prejudice in this case.  In *Williams,* the Court deemed prejudicial counsel's failure to discover and present mitigating evidence, notwithstanding that the state could have presented highly damaging adverse evidence in response. 529 U.S. at 396.  And Williams's criminal history was at least as serious as Harries's.  Williams had "savagely beat[en] an elderly woman, stol[en] two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw."  *Id.* at 418 (Rehnquist, C.J., concurring in part and

dissenting in part) (quoting 163 F.3d 860, 868 (4th Cir. 1998)).  Nonetheless, the Court held that "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id*. at 398.

We cannot, in the face of *Williams*, conclude that the presence of additional adverse evidence defeats Harries's claim of prejudice.  "Given both the nature and the extent of the abuse [Harries] suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." *Wiggins*, 539 U.S. at 535.

Moreover, having weighed all of the mitigating evidence—both that introduced at trial[2] and that introduced in the habeas proceeding—against the available aggravating evidence, we find it reasonably probable that but for Harries's counsel's deficient performance the outcome of Harries's sentencing proceeding would have been different.

Characteristics of Tennessee law strengthen a finding of prejudice.  Harries's jury had no choice but to impose the death penalty, given counsel's failure to present mitigating evidence. Tenn. Code Ann. § 39-2404(g) (Supp. 1981) (mandating imposition of the death penalty if the jury finds at least one aggravating circumstance that is not outweighed by any mitigating circumstances).  And given the unanimity required by Tennessee, the mitigating evidence needed to persuade only one juror.  Tenn. Code Ann. § 39-2404(h) (Supp. 1981) (permitting a court to impose the death penalty only if the jury unanimously recommends that penalty).  "Had the jury been able to place [Harries's] excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.[3]

## VI.  CONCLUSION

We affirm the district court's order denying the writ of habeas corpus with respect to Harries's guilt.  And consistent with our conclusion on ineffective assistance in the trial's sentencing phase, we affirm the granting of the writ, which vacated the death sentence and remanded for further proceedings.

---

[2]As the district court observed, "[t]he sum total of evidence presented by counsel in the punishment stage occupies less than three pages of the trial transcript, and consists of two documents:  (1) a one page letter to the trial court from BMHC advising the court that a trace of phenobarbital had been found in Harries' blood sample; and (2) a 1977 disciplinary write-up from the Ohio correctional system, where Harries was cited for having a syringe and an unidentified pill."  (Slip op. at 21–22 (citations omitted).)

[3]Because we find counsel's failure to investigate and present available mitigating evidence sufficient to support Harries's ineffective-assistance-of-counsel claim, we need not address whether counsel's failure to object to the introduction of allegedly inadmissible evidence also constitutes ineffective-assistance-of-counsel. Additionally, though the district court decided Harries's prosecutorial misconduct and cumulative error claims in his favor, we find it unnecessary to analyze those aspects of the appeal given our judgment on ineffective assistance in the sentencing phase of Harries's trial.