*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN GILLARD,
          *Petitioner-Appellee/Cross-Appellant,*

          *v.*

BETTY MITCHELL, Warden,
          *Respondent-Appellant/Cross-Appellee.*

Nos. 03-4261/4322

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-02996—Peter C. Economus, District Judge.

Argued: July 28, 2005

Decided and Filed: April 26, 2006

Before: SILER, DAUGHTREY, and SUTTON, Circuit Judges.

---

### COUNSEL

**ARGUED:** Heather L. Gosselin, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellant. Edmund W. Searby, SCOTT & SCOTT, Chagrin Falls, Ohio, for Appellee. **ON BRIEF:** Heather L. Gosselin, Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellant. Edmund W. Searby, SCOTT & SCOTT, Chagrin Falls, Ohio, Randall L. Porter, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

---

### OPINION

---

SILER, Circuit Judge. Betty Mitchell (the "Warden") appeals from the district court's order granting in part John Gillard's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Gillard, an Ohio prisoner under a death sentence, cross-appeals from the district court's denial in part of his petition. The district court granted Gillard habeas relief on two issues: his trial counsel labored under a conflict of interest and the cumulation of errors at trial violated his constitutional rights. Because Gillard is not entitled to habeas relief, we **REVERSE** the district court's order as to those two claims and **AFFIRM** as to all remaining claims.

## I. BACKGROUND

In *State v. Gillard*, 533 N.E.2d 272, 274-75 (Ohio 1988), the Ohio Supreme Court related these facts:

1

On December 31, 1984, Timothy Hendricks held a New Year's Eve party in his home at 213 Kennet Court, N.W., Canton. Among the guests were Ronnie Postlethwaite, Denise Maxwell, Leroy Ensign, and defendant-appellee's brother William Gillard. During the party, there was a fight between Ensign and Gillard. After Hendricks broke up the fight, William Gillard left.

The party ended between 3:00 and 4:00 a.m., January 1. Seven guests stayed the night, including Ensign, Postlethwaite and Maxwell.

Postlethwaite and Hendricks were both awakened by a gunshot outside. Hendricks went back to sleep. Postlethwaite got up and looked outside; he saw William Gillard fire a second shot into the air from a handgun. Postlethwaite tried unsuccessfully to wake Ensign.

The next thing Postlethwaite recalled was hearing the back door slammed open. He heard heavy steps "[l]ike horses trampling" and then a shot was fired.

Someone grabbed Postlethwaite's hair and pulled his head back. His assailant put a gun against his temple, shot him, and threw him to the floor. Postlethwaite then saw the gunman aim at Denise Maxwell's head and fire, killing her. Postlethwaite recognized the gunman as John Gillard.

Larry Beck, a neighbor, heard two gunshots between 3:00 and 3:30 a.m. At 4:15, he heard "at least two people" going towards 213 Kennet Court. About twelve minutes later, he heard more gunshots and heard two men running away from 213 Kennet Court.

At approximately 4:50 a.m., Canton police officer Sheldon Godshall arrived. Godshall asked Postlethwaite who had shot him. Postlethwaite said, "Dirty John." Godshall asked, "Dirty John who?" and Postlethwaite replied, "Dirty John Gillard." Another officer found Leroy Ensign's body lying near the entrance of the house.

On January 4, Ronald Webb, his wife, and Donald Gorby were in the kitchen of Webb's downstairs apartment in a two-family house in Wellsburg, West Virginia, when John Gillard came to the door. Webb testified that Gorby introduced Gillard to him as "Butch Johnson." At Gillard's request, Mrs. Webb cut Gillard's hair.

While Gillard was there, Milton Smith, who lived upstairs with Gorby, entered the kitchen, saw Gillard, and said: "Jesus Christ, I didn't recognize you without the beard, Dirty John." Smith and Gillard went upstairs. They eventually came back down to the kitchen, where Smith told Webb " * * * to keep him there and party with him and don't let him go nowhere, don't take him outside that house, don't take him to no bars." Smith then left.

As they talked, Webb mentioned to Gillard that he had "read in the paper where his brother was in jail for shooting some people in Canton." Gillard replied: "I pulled the trigger, my brother is taking the fall."

Later that day, Webb had a dispute with Gillard and Gorby. Webb threatened to go "to the law," whereupon Gillard said, "I got to get out of here." Webb then reported Gillard's presence to the Brooke County, West Virginia, sheriff's office. As a result, sheriff's deputies and Wellsburg police went to the Webb residence and arrested Gillard. Gillard identified himself to the arresting officers as "Butch Johnson."

John Gillard was indicted for the aggravated murders of Denise Maxwell and Leroy Ensign, and for the attempted aggravated murder of Ronnie Postlethwaite. In each of these three cases, two counts were returned: one charging that the offense was committed with prior calculation and design, R.C. 2903.01(A), and one charging felony murder, R.C. 2903.01(B). Each count of aggravated murder carried two death specifications: one charging a course of conduct involving the purposeful killing of two or more people, R.C. 2929.04(A)(5); and one charging murder coupled with aggravated burglary, R.C. 2929.04(A)(7). A seventh count charged Gillard with aggravated burglary, R.C. 2911.11.

Gillard's alibi defense consisted of testimony that he and Jerri Oney had been at the home of Tracy and Melissa Price between 10:30 p.m., December 31, and 4:30 a.m., January 1, and had gone directly from there to Oney's house. Oney and the Prices corroborated this account. Gillard admitted going to Wellsburg and meeting Webb, but denied introducing himself as "Butch Johnson" and telling Webb that he had been "the trigger man." Gillard also denied that Mrs. Webb had cut his hair.

Gillard was convicted of aggravated murder, attempted aggravated murder, and aggravated burglary in 1985. The jury recommended death, which the trial court accepted and sentenced Gillard accordingly. In 1987, however, the Ohio Court of Appeals vacated Gillard's convictions due to prosecutorial misconduct and the trial judge's failure to recuse himself. *See State v. Gillard*, No. CA-6701, 1987 WL 5768 (Ohio Ct. App. Jan. 21, 1987). The Ohio Supreme Court subsequently reversed this decision, affirmed all of Gillard's convictions, and remanded the matter to the Ohio Court of Appeals to independently review his sentence. *See Gillard*, 533 N.E.2d at 281-82. The same panel of the Ohio Court of Appeals recused itself from reviewing Gillard's sentence. A new three-judge panel was selected and it affirmed Gillard's death sentence. *See State v. Gillard*, No. CA-6701, 1990 WL 94632 (Ohio Ct. App. June 25, 1990).

Upon Gillard's appeal to the Ohio Supreme Court, he submitted a new claim: his trial counsel labored under a conflict of interest. The Ohio Supreme Court remanded the case to the trial court to conduct an evidentiary hearing. *See State v. Gillard*, 595 N.E.2d 878, 883 (Ohio 1992). At the conclusion of the evidentiary hearing, the trial court found no conflict of interest. The Ohio Supreme Court affirmed the conclusion that there was no conflict of interest, as well as Gillard's conviction and death sentence. *See State v. Gillard*, 679 N.E.2d 276, 285 (Ohio 1997).

Thereafter, Gillard's petition for state post-conviction relief was denied by the trial court, and the Ohio Court of Appeals affirmed. *See State v. Gillard*, Nos. 1997CA00318 & 1997CA00410, 1998 Ohio App. LEXIS 3088 (Ohio Ct. App. June 22, 1998). The Ohio Supreme Court declined to hear Gillard's appeal. In 1997, Gillard filed an application to reopen his appeal pursuant to Ohio R. App. P. 26(B), claiming that his appellate counsel was ineffective. The Ohio Court of Appeals granted his motion but concluded that the claims were meritless, and the Ohio Supreme Court affirmed. *See State v. Gillard*, 708 N.E.2d 708, 709-10 (Ohio 1999) (*per curiam*).

In 1999, Gillard sought habeas relief in federal court under 28 U.S.C. § 2254. The district court granted relief on two claims: Gillard's counsel acted under a conflict of interest so as to render ineffective assistance, and the cumulation of errors at trial resulted in the denial of Gillard's constitutional rights. Gillard's remaining fifteen claims were rejected as meritless. The Warden appealed and Gillard filed a cross-appeal. The district court and this court granted the following seven issues for a certificate of appealability ("COA"): (1) did Gillard's trial counsel labor under a conflict of interest; (2) should the trial court have conducted a hearing regarding trial counsel's conflict of interest; (3) was the trial court impartial and unbiased; (4) did the prosecution suppress evidence under *Brady v. Maryland*, 373 U.S. 83 (1963); (5) was Gillard's trial counsel ineffective

during the mitigation phase of the trial; (6) was there prosecutorial misconduct; and (7) did the cumulation of error at trial result in a violation of Gillard's constitutional rights?

## II.  STANDARD OF REVIEW

We review a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error.  *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).  Since Gillard filed his habeas petition after April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") apply.  *See Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003) (citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).  Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In *Williams v. Taylor*, 529 U.S. 362, 405 (2000), the Supreme Court held that a state-court decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]"or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result.  A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.  *Id.* at 407.  An objective standard is used to determine whether the state court's decision was reasonable.  *Id*. at 409.

## III.  DISCUSSION

### 1.  Gillard's trial counsel did not labor under a conflict of interest.

Gillard's counsel, Louis Martinez, had represented Gillard's brother, William, who had been a suspect in the two murders, before he represented John Gillard.  According to Gillard, if Martinez had not represented William he would have argued during the trial that William was the murderer.  The Warden argues that Gillard is not entitled to habeas relief because his trial counsel did not have an actual conflict of interest.  We agree.

Gillard has a Sixth Amendment right to conflict-free representation by his counsel.  *See Smith v. Anderson*, 689 F.2d 59, 62-63 (6th Cir. 1982).  For Gillard to establish a violation of this right, he must satisfy two components.  First, he must show that his counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed [him] by the Sixth Amendment."  *Wickline v. Mitchell*, 319 F.3d 813, 819 (6th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  Second, he "must show that the deficient performance prejudiced the defense[,] . . . [which] requires showing that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  *Id.* (quoting *Strickland*, 466 U.S. at 687).  "To demonstrate that counsel's performance was deficient, [Gillard] 'must show that counsel's representation fell below an objective standard of reasonableness.'"  *Roberts v. Carter*, 337 F.3d 609, 614 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688).  To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Wickline*, 319 F.3d at 819 (quoting *Strickland*, 466 U.S. at 694).  Our "[r]eview of counsel's performance is highly deferential and requires that [we] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *Id.* (quoting *Strickland*, 466 U.S. at 689).  "Both the performance and prejudice components of the ineffectiveness inquiry

are mixed questions of law and fact entitled to de novo review." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000).

Gillard can satisfy the above standard by showing that Martinez labored under an "actual conflict of interest." *See Strickland*, 466 U.S. at 692 (holding that proof of an actual conflict satisfies ineffectiveness prong, and creates a presumption of prejudice) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980)); *see also United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2002). "An actual conflict . . . is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).   Under *Sullivan*, if Gillard establishes that Martinez's divided loyalties affected his representation, then prejudice is presumed and need not be proven. *See Sullivan*, 446 U.S. at 348.   To that end, Gillard insists that "where counsel fails to pursue a strong and obvious defense, when pursuit of that defense would have inculpated counsel's other client, and where there is no countervailing benefit to [him] from foregoing that defense or other explanation for counsel's conduct, [it] amount[s] to evidence of disloyalty under any interpretation of *Sullivan*." *McFarland v. Yukins*, 356 F.3d 688, 707 (6th Cir. 2004).

Gillard's argument misses the mark because although Martinez had represented William during earlier pre-trial proceedings, the charges against William were dismissed (though he remained a suspect), and when William testified at Gillard's trial, Martinez was no longer representing him.   Thus, Gillard fails to demonstrate that Martinez labored under any conflict of interest. *See Sullivan*. 466 U.S. at 348 ("[U]ntil a defendant shows that his counsel *actively* represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.") (italics added). Unlike *Sullivan*, which addressed joint or simultaneous representation, this case involves successive representation.   "Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003).   Simultaneous and successive representation differ materially because in the latter, the attorney is no longer beholden to the former client.   Because the Supreme Court has not held that successive representation gives rise to a presumption of prejudice, the *Sullivan* presumption does not control this habeas case. *See Mickens*, 535 U.S. at 174-76; *Moss*, 323 F.3d at 460-62; *Smith v. Hofbauer*, 312 F.3d 809, 815-18 (6th Cir. 2002).

Gillard also fails to prove prejudice.   Although Gillard claims that Martinez missed several opportunities during the trial to shift the blame to William and portray him as the culprit, Gillard does not prove that Martinez's successive representation adversely affected his trial performance. The Ohio Supreme Court concluded that Martinez had an adequate strategy for refusing to project William as the murderer. *See Gillard*, 679 N.E.2d at 281-83.   For example, William was not an alternative suspect because "evidence of [his] involvement was not inconsistent with [John Gillard's] guilt, *i.e.*, none of the evidence implicating William either negated [John Gillard's] involvement or strengthened his alibi[,]" the prosecution argued that both brothers were involved in the murders, and Postlethwaite identified both brothers. *Id.* at 282.   The Ohio Supreme Court then explained that "[i]f Martinez emphasized William's involvement in the murders, he would have conceded that the state's theory was in part correct." *Id.* at 283.   If Martinez had blamed William for the murders, then he "risked substantiating Webb's testimony that William was 'taking the fall' for [John Gillard].   Likewise, taking the position that William fired shots outside the murder scene that night would bolster the general credibility of Postlethwaite, the state's sole identifying witness." *Id.* Gillard was not entitled to habeas relief on this claim.[1]   Therefore, Gillard fails to show that the Ohio Supreme Court's decision was "contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States."

---

[1] Because Martinez's health precluded him from testifying in Gillard's post-conviction proceedings, we are unable to determine why he chose this strategy.   However, it is immaterial because Martinez recognized during trial that there was no conflict, actual or otherwise.

**2.  The trial court did not err in failing to conduct an evidentiary hearing at trial concerning defense counsel's alleged conflict of interest, and such purported conflict did not mandate an automatic reversal of Gillard's convictions.**

Gillard argues that the trial court's failure to inquire as to Martinez's actual conflict of interest constitutes constitutional error and necessitates automatic reversal of his convictions.  *See Wood v. Georgia*, 450 U.S. 261, 272 n.18 (1981) (A reversal is mandated "when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'").  Because William was an unindicted co-conspirator in these crimes and a suspect in the murders, Gillard insists that Martinez's conflict was obvious and the trial court breached its duty to investigate the conflict regarding his representation.  This claim fails.

Although a trial court is required to conduct an inquiry where it "knows or reasonably should know that a particular conflict exists," this obligation does not arise "when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation[.]'"  *Mickens*, 535 U.S. at 168-69 (citations omitted).  Here, the trial court fully inquired into the possible conflict of interest presented by Martinez's successive representation, and the Ohio Supreme Court recognized only the possibility of a conflict of interest.  *See Gillard*, 595 N.E.2d at 883.  Martinez called William to testify during John Gillard's trial, to which the prosecution expressed reservations.  After the prosecution specifically described the possible conflict of interest, Martinez did "not feel that there is a question of a conflict and [was] capable of advising [William] of his rights."  The prosecution suggested that William be appointed separate counsel, and Martinez acknowledged that the trial court could appoint William another lawyer if there appeared to be a conflict.  Thereafter, the trial court appointed separate counsel to advise William about his rights before he testified.

The trial court did all that was required of it, and the Ohio Supreme Court's conclusion that Martinez did not have an actual conflict was neither contrary to, nor an unreasonable application of, clearly established Federal law.  Completely dissimilar to *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978), the *prosecution* timely objected to Martinez's successive representation, and Martinez chose to represent both brothers.  Because defense counsel "is in the best position to determine if a conflict exists," the trial court could have properly deferred to Martinez's judgment that no conflict existed. *See Mickens*, 535 U.S. at 167-68.  However, the trial court went further – instead of compelling Martinez to represent both brothers over the prosecution's objection, it appointed different counsel to advise William prior to his testimony.  Moreover, as previously determined, this claim does not warrant habeas relief because there was no actual conflict of interest. *See id.* at 168-74.  Since the trial court inquired into the purported conflict of interest, the automatic reversal rule was not implicated. *Cf. Holloway*, 435 U.S. at 488; *Riggs v. United States*, 209 F.3d 828, 831 n.1 (6th Cir. 2000).

**3.  The trial court was impartial and unbiased during Gillard's trial.**

Gillard also maintains that the trial court judge, James Unger, was biased because he (1) had been a prosecutor at the time Gillard was investigated for a 1972 murder, (2) was the chief county prosecutor at the time the offenses at issue were committed and when a warrant was issued for Gillard's arrest, and (3) received prejudicial information concerning Gillard during an *ex parte* hearing.[2]

---

[2]Gillard has procedurally defaulted the first of these three claims because he failed to raise it in his state appellate proceedings. *See Roberts v. Carter*, 337 F.3d 609, 613 (6th Cir. 2003), *cert. denied*, 540 U.S. 1151 (2004). However, even if it were not procedurally defaulted, it still fails on the merits because Gillard was not prejudiced.

All three claims are meritless. First, Gillard was afforded a fair trial before an unbiased judge, pursuant to the Fourteenth Amendment. *See Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). It is immaterial that Judge Unger was an assistant county prosecutor while Gillard was investigated for the 1972 murder. *See Jenkins v. Bordenkircher*, 611 F.2d 162, 166 (6th Cir. 1979) ("We have found no habeas corpus case which holds that it is a denial of due process for a judge to preside over a jury trial in a criminal case where the judge, as a prosecutor, had previously been involved in proceedings against the defendant in entirely unrelated cases.").

Second, Judge Unger was the chief county prosecutor at the time Gillard committed the murders in this case, but he left that position on January 3, 1985, in order to become a judge. A warrant for Gillard's arrest was issued on January 2, 1985, and Gillard was arrested on January 4. Gillard has completely failed to demonstrate that Judge Unger had any involvement in investigating the instant offenses during his final three days employed as the chief county prosecutor. *See Corbett v. Bordenkircher*, 615 F.2d 722, 723-24 (6th Cir. 1980); *Jenkins*, 611 F.2d at 166. Furthermore, Gillard has not pointed to any record evidence indicating that Judge Unger was biased. *See Corbett*, 615 F.2d at 723-24. He displayed no hostility or prejudgment toward Gillard during the trial.

Third, Judge Unger presided over a witness certification hearing in which the prosecution moved to delete Ronald Webb's name and address from the witness list or perpetuate his testimony because Gillard's brothers had threatened Webb and his family with physical harm if he testified against Gillard. *See* Ohio R. Crim. P. 16(b)(1)(e). Judge Unger granted the prosecution's motion to perpetuate Webb's testimony by deposition based on these allegations. During an *ex parte* hearing, however, the prosecutor provided Judge Unger with the following information: Gillard acted as president of the Outlaws motorcycle gang and his brothers had threatened to harm Webb, Webb's family, and several others if they testified against Gillard in this case. Although the Ohio Supreme Court held that Judge Unger erred in refusing to recuse himself because of the particularly inflammatory nature of this information, such error was only harmless because of the overwhelming evidence of Gillard's guilt. *See Gillard*, 533 N.E.2d at 276-77. This conclusion has been specifically approved by this court in a similar capital case from Ohio. *See Esparza v. Mitchell*, 310 F.3d 414, 424 (6th Cir. 2002), *rev'd on other grounds*, 540 U.S. 12 (2003). Further, Gillard points to nothing in the record suggesting that Judge Unger improperly considered, or was biased due to, the information he received during the *ex parte* hearing.

**4. The prosecution did not suppress material and exculpatory evidence under *Brady*.**

Gillard additionally claims that the prosecution failed to disclose relevant information and withheld exculpatory evidence from his counsel. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Although the prosecution argued during trial that Postlethwaite immediately identified "Dirty John" as the shooter to the police, a police report that was not furnished to Martinez reveals that Postlethwaite told two individuals at the crime scene that "Gillard" was the murderer. This could refer to either John or William. Contrary to the prosecution's argument, no police report reflects that Postlethwaite identified John Gillard to the police officers at the crime scene. Nevertheless, a police officer testified during trial that Postlethwaite identified "Dirty John" Gillard as the shooter. Further, while William was initially the principal suspect, the focus of the investigation turned to John Gillard after the police interviewed Postlethwaite (which they were unable to do initially due to his severe injuries).

"To establish a violation of *Brady*, [Gillard] has the burden of establishing that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (citation omitted). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability'

is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

Although the first two *Brady* prongs are satisfied, none of the withheld evidence was material. Postlethwaite's statement that "Gillard" was the shooter is not exculpatory; rather, it would only have been somewhat useful for impeachment purposes and does not contradict any trial testimony. *See Gillard*, 1998 WL 351442, at \*3-4. Furthermore, Postlethwaite told the police on January 2, one day after the crimes occurred, that John Gillard shot him and Denise Maxwell. This is clearly *inculpatory* and of no assistance. *See id.* Gillard has not demonstrated "a reasonable probability that his conviction or sentence would have been different had these materials been disclosed." *See Strickler v. Greene*, 527 U.S. 263, 296 (1999). As already mentioned, there was overwhelming evidence of Gillard's guilt. For instance, Postlethwaite informed the police that he could tell the difference between John and William, saw William fire the gun outside the house, and recognized "Dirty John" as the shooter. *See id.* at 273-75 & 291-96 (similar to case *sub judice*). Gillard failed to satisfy his burden.

**5. Gillard's trial counsel was not ineffective during the mitigation phase of the trial.**

According to Gillard, defense counsel was constitutionally ineffective during the sentencing phase of his trial because Martinez conducted no mitigation investigation, repeatedly told the jury that there were no mitigating factors, presented no mitigating evidence, and insinuated that the jury should impose the death penalty if it was sure of Gillard's guilt. Martinez exclusively relied upon residual doubt as the sole mitigating factor by arguing that Gillard was innocent; however, he never requested a residual doubt instruction from the trial court. Gillard claims that several mitigating factors existed, including provocation for the offense, absence of significant criminal history, intoxication, familial relationships, supportive children, and his educational and employment background.

The same *Strickland* standard applies here. *See Strickland*, 466 U.S. at 686. In *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003), the Supreme Court held that a defense counsel's failure to investigate a defendant's background and present some mitigating evidence to the jury during the sentencing phase may constitute ineffective assistance of counsel. *See also Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005) (citing *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001)) ("Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'"). In considering whether Martinez exercised reasonable professional judgment, the crux is not whether he "should have presented a mitigation case[;] [r]ather, we focus on whether the investigation supporting [his] decision not to introduce mitigating evidence of [Gillard's] background *was itself reasonable*." *Id.* (citing *Wiggins*, 539 U.S. at 522-23); *see Harries*, 417 F.3d at 638. When evaluating Martinez's performance, this court considers that quantum of evidence Martinez already knew, as well as "whether [this] known evidence would lead a reasonable attorney to investigate further." *See Wiggins*, 539 U.S. at 527. The question here is whether Martinez abandoned Gillard during the sentencing phase, thereby "making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28.

Although Gillard's observations are accurate, we cannot resolve that Martinez was deficient in failing to investigate and present mitigating evidence on Gillard's behalf. The Supreme Court has confirmed that residual doubts may benefit a capital defendant and are therefore appropriately considered as mitigating evidence during the sentencing phase of trial. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986). More importantly, because much of Gillard's mitigating evidence was presented to the jury during the guilt phase, Martinez was not deficient for failing to revisit this same evidence during the sentencing phase. *See Bell v. Cone*, 535 U.S. 685, 699-700 (2002). Gillard

related mitigating evidence during his testimony, including his familial relationships.[3] Furthermore, keeping in mind that Martinez's whole theory was an alibi/actual innocence, we must indulge that "'strong presumption' that [Martinez's] conduct [fell] within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission . . . was unreasonable in the harsh light of hindsight." *Cone*, 535 U.S. at 702 (citing *Strickland*, 466 U.S. at 689). Martinez employed a sound trial strategy – Gillard was somewhere other than the crime scene when the murders occurred and thus innocent – and an emphasis on mitigating evidence during the sentencing phase could have very well undermined this entire strategy.

Martinez's concession that there was no mitigating evidence does not denote a complete abandonment of Gillard or abdication of advocacy. *See Martin v. Mitchell*, 280 F.3d 594, 609-14 (6th Cir. 2002); *cf. Wiggins*, 539 U.S. at 527-28. Likewise, Martinez's suggestion that the jury should impose the death penalty because it would be consistent with the "mistake" it made when it adjudged Gillard guilty was not deficient. Martinez told the jury that its first mistake was convicting Gillard, but a second mistake "will be a fatal one" if it disbelieved Gillard's story in spite of "the possible ramifications of all of the evidence." Martinez asked the jury "to impose a penalty other than the death penalty at this time based on the proposition that John Gillard was not there." In addition, Martinez's suggestion could have been an attempt to bolster his credibility with the jury. Gillard's entire defense rested on his alibi that he was with his girlfriend when the murders occurred and Martinez elected to pursue that theory until the very end. Again, all of this was sound trial strategy.

Given that Gillard has not pointed to any additional mitigating evidence that should have been discovered but was not and that the jury heard all mitigating evidence that Gillard wished to present, he cannot be heard to claim that his defense counsel was deficient. This is so despite Martinez's choice not to label these facts as mitigating evidence to the jury. *See Workman v. Bell*, 178 F.3d 759, 770-71 (6th Cir. 1998) (Although a failure "to present any mitigating evidence is disfavored[,] . . . it is clear that [capital defendant's] trial counsel investigated his background and character but determined for tactical reasons not to present such information to the jury[]" during the sentencing phase.).

Nevertheless, even assuming *arguendo* that Martinez's performance was deficient, Gillard is not entitled to habeas relief because he was not prejudiced. "For [Martinez's] objectively unreasonable performance to constitute ineffective assistance of counsel, *Strickland* requires [Gillard] to prove prejudice 'satisfied by showing a reasonable probability that but for such performance the trial outcome would have been different.'" *Harries*, 417 F.3d at 639 (quoting *Coleman*, 268 F.3d at 452). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 639 (quoting *Wiggins*, 539 U.S. at 534). Gillard need only show that one juror would have reached a different result to establish prejudice. *See Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 344 (2004).

Under the facts of this case, defense counsel's failure to introduce any other mitigating evidence during the sentencing phase and his admission to the jury that no mitigating evidence existed do not constitute ineffective assistance of counsel. The jury was privy to this mitigating evidence during the trial's guilt phase and Martinez was not obligated to reintroduce it. *See Cone*, 535 U.S. at 699-700. Even if Martinez had specifically delineated all mitigating evidence during the sentencing phase, it was still insufficient to create a "reasonable probability that at least one juror would have struck a different balance." *Hamblin*, 354 F.3d at 493 (quoting *Wiggins*, 539 U.S. at

---

[3]The Ohio Supreme Court determined that "residual doubt [was] not an important mitigating factor in this case" due to the "overwhelming and convincing" evidence of Gillard's guilt. *See Gillard*, 679 N.E.2d at 284. Contrary to Gillard's erroneous interpretation of this language, the Ohio Supreme Court indeed found that residual doubt was a mitigating factor, just not a convincing one.

537).  The evidence Gillard offered to mitigate his culpability included the absence of a significant criminal history, his intoxication at the time of the offenses, his familial relationships, and his educational and solid employment history.  None of this rises anywhere near the level of mitigating evidence required by this court to establish prejudice or the reasonable probability that the trial's outcome would have been different.  *See, e.g., Harries*, 417 F.3d at 639-40 (defense counsel's investigation would have revealed petitioner's traumatic childhood marked by severe physical abuse, violent family, constant incarceration, suicide attempt, brain damage, and social disorder, if he had investigated); *Hamblin*, 354 F.3d at 490-91 (defense counsel failed to discover evidence of abject poverty, physical abuse, family violence, neglect, instability, and lack of education); *Coleman*, 268 F.3d at 450-51 (defense counsel did not investigate petitioner's physical and psychological abuse, exposure to group sex, bestiality, and pedophilia, abandonment, and personality disorder).  Gillard's evidence is completely dissimilar to any of the foregoing and is insufficient to tip the scale in his favor.

The Ohio Supreme Court's decision is not contrary to, nor an unreasonable application of, clearly established Federal law, and it did not apply *Strickland* to these facts in an objectively unreasonable manner.  *See Gillard*, 533 N.E.2d at 281.

## 6.  The prosecutorial improprieties during Gillard's trial did not violate his constitutional rights.

Gillard lastly insists that prosecutorial misconduct so infected his trial with unfairness as to result in a denial of due process.  According to Gillard, the prosecution unfairly attacked his character, argued prejudicial matters outside the record, offered expressions of personal belief, and made inflammatory arguments designed to enrage and unfairly prejudice the jury.  During trial, the prosecution occasionally referred to Gillard as "Dirty John," asked Gillard on cross-examination whether he was called "Dirty John" because he would "shoot an innocent sleeping woman on a couch," questioned his membership in several motorcycle gangs, suggested that William had attempted to "fix" the trial, stated that Gillard was a "lie," "a fraud," and "a con" because he wore a suit during the trial, and displayed photographs of the crime scene during closing argument.

On habeas review, this court reviews claims of prosecutorial misconduct deferentially. *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).  To be cognizable, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  Even if the prosecution's conduct was improper or even "universally condemned," *id.,* this court can only reverse if the statements were so flagrant as to render the entire trial fundamentally unfair.  If we find a statement improper, four factors are considered in determining whether the impropriety is flagrant:  "(1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial." *Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003).  Nevertheless, considering a prosecutor's wide latitude in submitting arguments to a jury, we recognize "that reversal of a conviction should not be ordered when a prosecutor's behavior, even though inappropriate, has not resulted in prejudicial error." *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990).

Considering each of the four aforementioned factors, we conclude that none of Gillard's examples of alleged prosecutorial misconduct rises to such a level as to justify habeas relief.  Initially, references to Gillard as "Dirty John" were entirely proper because that was his nickname, which was relevant because Postlethwaite had identified "Dirty John" as the shooter.  Any remarks as to his nickname did not necessarily mislead or prejudice the jury.  The prosecution's inquiry regarding Gillard's motorcycle gang affiliation was also proper because he acquired the nickname "Dirty John" while working on motorcycles during his youth.  The information concerning Gillard's

affiliation with motorcycle gangs was elicited during cross-examination and went to his credibility. Gillard does not submit that the prosecutor lacked a good-faith basis for questioning him regarding his motorcycle gang membership. *See Gillard*, 533 N.E.2d at 277-78. Similarly, any reference to Gillard's clothing would have only a slight tendency to divert the jury from the actual issues in the trial. *See Fussell v. Morris*, 884 F.2d 579, 1989 WL 100857, at \*4 (6th Cir. 1989) (table).

Next, the prosecution's remarks were isolated since they occurred primarily during closing argument at the conclusion of a lengthy six-week trial. *See Millender v. Adams*, 376 F.3d 520, 528-29 (6th Cir. 2004); *United States v. Solivan*, 937 F.2d 1146, 1155 (6th Cir. 1991) (prosecutorial misconduct was "isolated to one portion of the trial, closing argument"). In addition, the trial court employed limiting instructions to rectify many of the improper remarks and explained to the jury that counsel's arguments were not evidence. *See Roe v. Baker*, 316 F.3d 557, 566 (6th Cir. 2002). These isolated remarks did not result in a denial of Gillard's right to due process. *See Millender*, 376 F.3d at 528-29.

Further, although it appears that the prosecution deliberately made the complained-of remarks, this action did not render Gillard's trial constitutionally unfair. Rather, the prosecution was only summarizing the evidence (and did not misstate it), Gillard's testimony, and the trial's events for the jury. *See Hutchison v. Bell*, 303 F.3d 720, 750-51 (6th Cir. 2002); *Hill v. Brigano*, 199 F.3d 833, 847-48 (6th Cir. 1999) (no misconduct when prosecution only commented on the evidence during closing argument).

Finally, as the Ohio Supreme Court observed, there was overwhelming evidence of Gillard's guilt. *See Bates v. Bell*, 402 F.3d 635, 648-49 (6th Cir. 2005). Despite the prosecution's exhibition of the crime scene photographs during its closing argument, Gillard was identified by an eyewitness (who knew him) as the shooter, confessed to Ronald Webb, "I pulled the trigger, my brother is taking the fall," fled after the crimes were committed, changed his appearance, gave a false name to the arresting police officers, and had the murder weapon two weeks before the crimes occurred. The prosecution's statements and actions here were not "so egregious as to render the trial fundamentally unfair." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*).

### 7. The cumulation of errors at Gillard's trial does not warrant habeas relief.

The Warden also contends that the district court improperly granted habeas relief based upon the cumulative effect of the errors during Gillard's trial. While we have recognized that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair," *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983), the "Supreme Court has not held that distinct constitutional *claims* can be cumulated to grant habeas relief," *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (italics added). Thus, the Ohio courts' determination is not contrary to, or an unreasonable application of, clearly established Federal law as determined by the United State Supreme Court because Gillard's individual assignments of error would not support habeas relief, and the cumulative effect thereof is likewise insufficient. *See Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (identical to case at bar).

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's order.  We **REVERSE** the district court's grant of Gillard's writ regarding ineffective assistance of counsel due to a conflict of interest and cumulative error, and **AFFIRM** the denial of the remainder of his writ of habeas corpus.