RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD NIELDS,

      *Petitioner-Appellant,*

    *v.*

MARGARET BRADSHAW, Warden,

      *Respondent-Appellee.*

No. 05-4001

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00019—Thomas M. Rose, District Judge.

Argued: February 1, 2007

Decided and Filed: April 6, 2007

Before: BOGGS, Chief Judge; GILMAN and SUTTON, Circuit Judges.

---

**COUNSEL**

**ARGUED:** T. Kenneth Lee, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Carol Ann Ellensohn, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** T. Kenneth Lee, Kyle E. Timken, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Carol Ann Ellensohn, Anna Marie Franceschelli, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. In 1997, an Ohio jury convicted Richard Nields of aggravated murder with prior calculation and design, aggravated felony murder, and aggravated robbery. At the conclusion of the penalty phase, the state trial court imposed the jury's recommended sentence of death. Nields appealed, but both the Ohio Court of Appeals and the Ohio Supreme Court found his claims to be without merit. Subsequently, Nields filed a petition for a writ of habeas corpus in federal district court that raised 30 alleged constitutional errors in the state-court proceedings. Adopting the Report and Recommendation of the designated magistrate judge in its entirety, the district court both denied the petition and declined to certify any of Nields's claims for appeal. This court, however, granted Nields a Certificate of Appealability (COA) as to five of his claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

# I. BACKGROUND

The Ohio Supreme Court set forth the following facts and procedural history of this case in *State v. Nields*, 752 N.E.2d 859, 870-73 (Ohio 2001):

On the night of March 27, 1997, Patricia Newsome was found strangled on her kitchen floor. Police arrested Richard Nields, defendant-appellant, Newsome's frequent live-in companion, at Newsome's home that night, not long after Springfield Township Police had transported him there. Defendant was indicted for aggravated murder and aggravated robbery, found guilty as charged, and sentenced to death.

Prior to 1997, defendant and Patricia Newsome had an on-again, off-again relationship for approximately ten to twelve years. In the year leading up to the murder, they lived together at Newsome's home in Finneytown, Springfield Township, in Hamilton County. Newsome worked as a realtor in Fairfield, and defendant was a keyboard musician who was out of work most of the time. On March 27, 1997, Newsome had lunch with her friend, Dorothy Kiser. Newsome told Kiser that she asked defendant to move out. Even though defendant had packed his clothes in his car in order to move out, "he kept coming back to the house."

In the weeks leading up to March 27, defendant would call Newsome with hostile messages. On one occasion, an angry call for Newsome was received by the office receptionist, Floanna Ziegler, from a man identifying himself as a musician. Newsome wrote the incident down and told Ziegler, "I'm trying to file charges against him and I want to document everything that he said to you."

During the afternoon of March 27, Dorothy Alvin had a conversation with defendant, who was a stranger to her, at Lulu's bar in Springfield Township. Defendant told Alvin that the lady whose house he lived in was throwing him out. Defendant further told Alvin, "I'd like to kill her, but I guess I won't do that because I don't want to go to prison."

Later, during the evening of March 27, Barbara Beck and Patricia Denier were dining at the Briarwood Lounge on Hamilton Avenue. At approximately 10:30 p.m., defendant entered the bar and approached the two women, both of whom he knew. Both women noticed blood on his right hand and asked him what happened. Defendant said to them, "[Y]ou'll hear it on the news tomorrow." Defendant also kept repeating, "I'm in serious, serious trouble." Both women thought that he was in shock and was acting strange. Neither smelled any alcohol on his breath.

As Beck and Denier left the lounge, defendant walked them to their car and asked to go with them. After they declined to take defendant with them, defendant told them, "I'm going to be driving home in a Cadillac." They saw defendant walk across the street to a white Cadillac. Friends of Patricia Newsome testified that she owned a white Cadillac but never let anyone else drive it, especially defendant, "because of the way he drank."

Anthony Studenka was at DJ's Pub on Winton Road on the night of March 27, a little before midnight and sat down next to a person at the bar who "told me he killed somebody." That person was defendant. Defendant showed Studenka his hands, which had cuts on them, and told Studenka that he had killed some kid who was a drug pusher. Defendant then suddenly became belligerent and started calling Studenka insulting names. Kimberly Brooks, a friend of Studenka, also heard

defendant declare that he had killed someone and noticed that defendant had "dried blood all over" his hands. However, defendant then denied that he had killed anyone, and said that he had helped drag the body away. Brooks called 911 to report defendant's statements.

Springfield Township Police Officer Greg Huber was in front of DJ's Pub when he heard a radio call that a male at the bar was bragging that he had killed someone. Huber encountered defendant inside the bar and asked him to step outside because of the noise. After initially refusing to do so, defendant went outside and spoke with Huber, who then noticed blood on both of defendant's hands. When asked about the blood, defendant told Huber that he was in a fight across the street at Lulu's bar. At that time, Police Sgt. Ken Volz arrived on the scene. Huber then went to Lulu's to investigate and discovered that there had been no fight there.

Sgt. Volz and another officer, Clayton Smith, spoke with defendant outside of DJ's Pub. Defendant told the officers that the story of the killing he was telling inside the bar was really about a Clint Eastwood movie. Smith, who was familiar with such movies, asked defendant questions to find out to which movie defendant was referring. However, defendant could not sufficiently answer any of his questions. Sgt. Volz then instructed Smith to drive defendant home due to his "intoxication level."

Defendant pointed to the white Cadillac across the way as "his girlfriend's car" that he drove, which Volz learned was registered to Patricia Newsome. Volz then went to Newsome's house on 8527 Pringle Avenue, "to check on [her] well being." When he peered through the front window, he could see that the television and some lights were on, and he could hear the dog barking inside.

As Officer Smith drove up to the Pringle Avenue residence with defendant, Sgt. Volz was standing on the front porch area. Defendant "became very uptight and aggressive and verbal and almost yelling" at Smith. Defendant declared that they were not going into the house without a search warrant. Defendant eventually calmed down, and the officers let him enter the house and hoped he would calm down for the night. However, after defendant entered the house, the officers could see defendant through the front window "waving his hands * * * in an erratic fashion."

As the officers were leaving, they noticed the door on the attached garage was open. Officer Smith entered the open lit garage and peered in a window that looked into the kitchen. Smith saw "a female * * * on the ground [who] * * * was obviously deceased." The officers went to the front door and saw defendant through the front window still waving his arms. They knocked on the door, and as defendant opened the door, they grabbed his arm, pulled him outside, and handcuffed him. Police arrested defendant and advised him of his *Miranda* rights. Sgt. Volz entered the house to check on the victim but could not detect a pulse.

While defendant was detained in the police cruiser, he kept asking Officer Smith, "[I]s she alive?" During the arrest, police found fifteen traveler's checks in defendant's possession, all of which bore Patricia Newsome's name. Police Chief David Heimpold arrived at the scene and readvised defendant of his *Miranda* rights. Defendant told Heimpold that he and Newsome had been in an argument. She hit him with the telephone, he then pushed her, and she hit her head on a bookcase. Defendant also mentioned that someone named "Bob" was also there, but shortly thereafter, he admitted that this was a lie. Defendant admitted that he had choked Newsome after they had had a fight. The assistant medical examiner, who performed

the autopsy on Newsome, concluded that she had died from asphyxia due to manual strangulation.

Defendant was incarcerated at the Hamilton County Justice Center. Two days after the murder, he talked with Timothy Griffis, who was serving time that weekend for nonpayment of child support. Defendant told Griffis that "he had killed his girlfriend," that they had argued, and that he "jumped on top of her, started beating her up." Defendant said that he then went to a bar. He came back to Newsome's home to see if she was breathing and started strangling her. He laid the phone on top of Newsome's chest, called her either "bitch" or "baby," and told her, "Call me from heaven." According to Griffis, defendant at times appeared to be remorseful, but at other times, he exhibited a carefree attitude while recounting the details of the murder. Defendant also told Griffis that he took money, jewelry, and traveler's checks out of Newsome's purse. According to Griffis, defendant was kind of upset because he could not use the traveler's checks.

On May 2, 1997, the grand jury indicted defendant for aggravated robbery, aggravated murder with prior calculation and design, and aggravated felony-murder during an aggravated robbery. A death penalty specification attached to the aggravated murder counts alleged that defendant had committed aggravated murder during the aggravated robbery and that he was either the principal offender or committed the aggravated murder with prior calculation and design. R.C. 2929.04(A)(7).

Prior to trial, a suppression hearing was held on defendant's motion to suppress defendant's statement to police after he requested an attorney, his statements at DJ's Pub, and his statement to Timothy Griffis because the police entered the curtilage of Newsome's home without a warrant. The trial court denied the motion to suppress, holding that exigent circumstances justified the search of the home. The court further held that defendant's statements to police after he requested an attorney were freely and voluntarily given and that defendant's statement at the Justice Center to Griffis and his statements at the pub were not suppressible.

The state called numerous witnesses to establish defendant's guilt before a jury. The defense conceded that defendant had killed Newsome but disputed that defendant had purposefully or "knowingly caused the death of Patricia Newsome" because he was "under the influence of sudden passion * * * and rage." During the trial, Officer Nancy Richter testified that she discovered three pages of yellow legal paper entitled "Record of Abuse" at Newsome's residence while she and Newsome's children were looking for her will several days after the murder. A forensic document examiner with the coroner's office determined that the "Record of Abuse" pages were written by Newsome.

Also at trial, Springfield Township Police Officer Paul Rook testified that he responded to a "domestic call" at Newsome's residence on March 1, 1997. At that time, Newsome told Rook that she wanted defendant to leave her home and that she was afraid of him. Rook and another officer took defendant from Newsome's residence until he could find someone else who would come and get him. The defense called one witness.

After deliberation, the jury found defendant guilty as charged.

At the mitigation hearing, the defense presented three witnesses: defendant's sister, Rochelle Pittman; Dr. Emmett Cooper, psychiatrist and pharmacologist; and Assistant Public Defender James Slattery. Pittman chronicled defendant's family life, including the fact that defendant's father was an alcoholic who left the family when defendant was in high school. Pittman also testified that she became friends with Newsome and that a few weeks before the murder, they discussed having defendant committed at Newsome's suggestion.

Dr. Cooper testified that defendant was an alcoholic and reviewed the medical ailments that defendant suffered as a result of his alcoholism. Dr. Cooper observed that defendant's time in jail since his arrest represented his longest period of sustained sobriety since 1976. Slattery, an admitted alcoholic, testified as to the deleterious effects of alcohol and how his alcoholism interfered with his ability to do what was best for himself as well as his ability to practice law.

## II. STANDARD OF REVIEW AND SUMMARY OF CLAIMS

### A.    Standard of review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a federal court

> may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)). This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

The first line of analysis under AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis and quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id*. at 409-11.

The second line of analysis under AEDPA concerns findings of fact made by the state courts. AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The appeals court gives complete deference to the federal district court's and state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004) (citations omitted).

AEDPA, however, does not automatically govern our review of every one of Nields's habeas claims. Instead, as this court recently clarified, "[t]he AEDPA standard of review applies only to 'any claim that was adjudicated on the merits in State court proceedings.'" *Danner v. Motley*,

448 F.3d 372, 376 (6th Cir. 2006) (quoting 28 U.S.C. § 2254(d)).  We will therefore apply the de novo standard of review where the Ohio state courts have not ruled on the merits of a particular claim in Nields's petition.  *Id.*

## B.        Summary of Nields's claims on appeal

The five issues covered by the COA are as follows: (1) whether prosecutorial misconduct during the penalty phase violated Nields's constitutional rights, (2) whether Nields's counsel was constitutionally ineffective for failing to investigate and present mitigating evidence, (3) whether Nields's counsel was constitutionally ineffective for failing to retain an expert to testify to the causal relationship, if any, between Nields's alcoholism and his behavior on the night of the murder, (4) whether Nields's counsel was constitutionally ineffective for failing to request a voir dire of the jurors after learning that several had seen Nields in handcuffs, and (5) whether Nields's counsel was constitutionally ineffective for failing to introduce evidence of Nields's remorse.

After carefully considering the record on appeal, the briefs of the parties, and the applicable law, and having had the benefit of oral argument, we find no error in the district court's denial of Nields's habeas corpus petition.  Each of the five COA issues is discussed in detail below.

## III.  DETAILED ANALYSIS

## A.        Prosecutorial misconduct during the penalty phase

Nields first argues that several statements made by the prosecutor to the jury during the penalty phase regarding Patricia Newsome's state of mind impermissibly allowed the jury to consider nonstatutory aggravating circumstances.  Specifically, Nields cites the prosecutor's penalty-phase closing argument, in which the prosecutor stated, among other things, "How about Patricia—how Patricia Newsome felt when she was being viciously beaten?" and "How did Patricia Newsome feel, what was going through her mind as the defendant stole her property and inflicted serious physical harm on her person?"

Because Nields's counsel did not object to these allegedly improper statements at the time, this claim is procedurally defaulted.  To excuse the default for the purpose of habeas review, Nields must establish both "cause" and "prejudice."  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  He has failed to do so.

### 1.        The Ohio Supreme Court's decision

Prior to this appeal, the scope of Nields's prosecutorial-misconduct claim was rather broad.  It covered, and the Ohio Supreme Court correspondingly considered, not only the prosecutor's allegedly improper statements during the penalty phase, but also those made during both voir dire and the guilt phase.  Regarding the specific comments at issue in this appeal, the Ohio Supreme Court began its analysis by noting that "defendant's failure to object waived all but plain error." *Nields*, 752 N.E.2d at 895.  It then found that, although the prosecutor's "comments referring to what the victim was feeling or thinking may constitute error," any error was not plain because "these comments were not egregious enough to deprive defendant of a fair trial." *Id.*  In addition, regarding those few comments to which Nields's counsel did object, "[t]he trial court cured any error by reminding the jury that arguments of counsel are not evidence, and it was for them to determine what the evidence showed." *Id.* at 896.

### 2.        The district court's review

The magistrate judge's Report and Recommendation adopted by the district court concluded that the bulk of Nields's prosecutorial-misconduct claim was procedurally defaulted and that he

"makes no effort in his Traverse to show excusing cause and prejudice." In addition, "[w]ith respect to those claims of prosecutorial misconduct which survive procedural default, Petitioner has not shown how any such claimed misconduct either was indeed misconduct or how, cumulatively, such instances of misconduct as the Ohio Supreme Court found deprived Petitioner of a fair trial." Accordingly, "Petitioner has not demonstrated that the Ohio Supreme Court's decision on this claim was an objectively unreasonable application of the relevant United States Supreme Court precedent [in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)]."

### 3. *Our review*

We agree with the district court that the opinion of the Ohio Supreme Court did not constitute an unreasonable application of clearly established federal law. Although counsel was deficient in failing to object to the prosecutor's unquestionably improper comments to the jury during the penalty phase, this deficiency did not prejudice Nields. The judge specifically instructed the jury at the conclusion of the penalty phase that arguments by the attorneys did not constitute evidence. In addition, "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (citing *Barclay v. Florida*, 463 U.S. 939, 956 (1983)). Finally, where, as here, the state appellate courts independently reweigh only the *relevant*, statutorily recognized aggravating circumstances against the mitigating factors and determine death to be an appropriate sentence, the jury's consideration of an irrelevant, nonstatutory aggravating factor is generally not prejudicial. *See Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir. 2001) (citing *Barclay v. Florida*, 463 U.S. 939, 956 (1983), and *Wainwright v. Goode*, 464 U.S. 78 (1983)).

Nields attempts to overcome this analysis by arguing that procedural default is an improper framework within which to evaluate his claim. Because, in his opinion, "[t]he Ohio Supreme Court has applied its contemporaneous objection rule unevenly and inconsistently with regard to similar claims alleging prosecutorial misconduct," Nields contends that this court cannot "honor" the rule as "an independent and adequate state ground" under the four-pronged, procedural-default test established by this court in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). But in the Report and Recommendation adopted by the district court, the magistrate judge explicitly conducted a *Maupin* analysis and concluded that Nields's claim was procedurally defaulted. Nields's argument, moreover, is squarely foreclosed by several of this court's later precedents. In *Mason v. Mitchell*, most notably, the court began its prosecutorial-misconduct analysis by "first not[ing] our previous holding 'that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice.'" 320 F.3d 604, 635 (6th Cir. 2003) (quoting *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001)).

Nields argues separately that this court erred in granting him a COA as to only one particular instance of prosecutorial misconduct during the prosecutor's closing argument at the penalty phase. He contends that the effect of prosecutorial misconduct can be adequately judged only in the larger context of an entire trial, especially because one of the factors for reviewing such claims is whether the alleged misconduct was "isolated" or part of a larger pattern in light of "the totality of the circumstances." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly*, 416 U.S. at 643)). Although this argument correctly states the proper legal standard, it does not alter the conclusion that the Ohio appellate courts—which, as part of their independent reweighing of the aggravating and mitigating circumstances, *did* consider more than the single instance of prosecutorial misconduct at issue here—reasonably applied federal law in upholding Nields's death sentence. *See Nields*, 752 N.E.2d at 894 (addressing Nields's contention that "he was denied a fair trial due to prosecutorial misconduct *throughout all phases of the trial*" by separately analyzing the alleged improprieties during voir dire, the guilt phase, and the mitigation phase) (emphasis added).

In other words, we would reach the same conclusion even if we had extended the scope of Nields's prosecutorial-misconduct claim in the COA to cover the entirety of the prosecutor's arguments and conduct during both the guilt and penalty phases of the trial. The words of the district court bear repeating: "With respect to those claims of prosecutorial misconduct which survive procedural default, Petitioner has not shown how any such claimed misconduct either was indeed misconduct or how, *cumulatively*, such instances of misconduct as the Ohio Supreme Court found deprived Petitioner of a fair trial." (Emphasis added.)

**B.        Failure to investigate and present mitigating evidence**

Nields next argues that his counsel was constitutionally deficient for failing to investigate and present mitigating evidence that would have "humanized" him in the eyes of the jury. Specifically, Nields claims that "[i]f counsel had conducted a full investigation," they would have learned that "Nields's childhood home life was chaotic and neglectful," that "he was an expert and dedicated musician whose life was once very focused," that "he had several successful employment experiences and was a hard worker," that "he did not drink while he was working," and that he "was a dependable, kind-hearted friend and an extremely helpful, friendly person."

### 1.        The Ohio Supreme Court's decision

The Ohio Supreme Court was the last state court to review this claim during postconviction proceedings. Because its review was on the merits, we apply AEDPA deference. The court found, and we agree, that although Nields's counsel might well have been able to do more, "a review of the mitigation transcript indicates that counsel presented substantial mitigation on defendant's behalf." *Nields*, 752 N.E.2d at 892. Counsel's decision not to present additional mitigation evidence, moreover, likely resulted from reasoned strategy:

> On the other hand, . . . it may be, for instance, that counsel conducted a diligent investigation, but was simply unable to find substantial mitigating evidence. Defendant fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. The record does not show counsel's thought processes, nor does it show a failure to make reasonable investigations.

*Id.* (citing *Strickland*, 466 U.S. at 689, 691) (brackets, citations, and quotation marks omitted).

In addition, the fact that both Dr. Cooper and Rochelle Pittman testified to facts objectively adverse to Nields did not make their testimony a prejudicial "disaster." *Nields*, 752 N.E.2d at 891. "[O]verall, defense counsel presented substantial mitigating evidence of defendant's alcoholism and the problems he encountered throughout life as a result of alcohol. Thus, no reasonable probability exists that, in the absence of these alleged errors, the result of the trial would have been different." *Id.*

### 2.        District court's review

The Report and Recommendation adopted by the district court concluded that "[p]resent counsel have failed to show what witnesses could better have presented the critical testimony elicited from [Dr. Cooper and Rochelle Pittman]." It also reinforced that, although portions of Dr. Cooper's testimony were "adverse to Nields," "defense counsel cannot be faulted for choosing experts who insist on telling the truth as the[y] see it." Similarly, although Pittman's testimony allowed the prosecution to introduce her diary that was damaging in parts, "Pittman was a crucial witness for the impact of alcohol on her brother's life and how substance abuse had affected his entire family." Accordingly, the Report and Recommendation concluded that "the Ohio Supreme Court's application of *Strickland* was not objectively unreasonable."

Nields challenged this finding on the ground that the magistrate judge "did not consider evidence of the ineffective assistance of counsel in the form of affidavits produced at state post-conviction proceedings regarding trial counsel's mitigation investigation." The district court conceded that the magistrate judge did not consider the affidavits in question, but concluded that doing so would not have made a difference in his ultimate recommendation:

> [T]he only evidence identified in the Traverse for consideration by this Court is "boilerplate" about how important it is to do a thorough investigation, the failure to adequately talk to Nield[s]'s sister and a conclusory statement regarding failure to adequately interview and present the testimony of witnesses for mitigation. In addition, Petitioner did not seek an evidentiary hearing to present the testimony of the additional witnesses.

> Nield[s]'s sister was called as a witness during the mitigation phase. Further, the Petitioner has not specifically brought evidence to this Court's attention about what investigation was done by trial counsel or what strategic decisions were made by them. No specific evidence of lack of preparation has been presented to this Court.

### 3.    *Our review*

We agree with the district court that the Ohio Supreme Court did not unreasonably apply clearly established federal law in denying Nields's claim. Nields's argument is without merit for two basic reasons. First, counsel did investigate and present "substantial" mitigating evidence, even if not to the degree that Nields would have liked. One of counsel's first moves was to employ a mitigation specialist, Jim Crates, to investigate Nields's history and background. James O'Connell, a Ph.D., soon joined the team as well. In all, counsel spent nearly 150 hours investigating and nearly 30 hours interviewing potential witnesses in preparation for trial. At the mitigation hearing, Nields's counsel called three of those witnesses to testify, two of whom spoke principally about Nields's alcoholism as discussed in Part III.C. below. Nields's sister Rochelle Pittman, the third witness, testified about Nields's childhood and family background, including how alcoholism and substance abuse generally had affected the family.

This court has recently upheld death sentences despite cursory mitigation investigations that make the one conducted by Nields's attorneys seem not only adequate but incredibly thorough by comparison. *See, e.g.*, *Keith v. Mitchell*, 466 F.3d 540, 540-41 (6th Cir. 2006) (Clay, J., dissenting from the denial of rehearing en banc) ("Despite a long and well-recognized line of Supreme Court case law requiring counsel in death penalty cases to conduct at least a cursory investigation into mitigation evidence, it is uncontested in this case that defense counsel failed to conduct *any* investigation."), *cert. denied*, *Keith v. Houk*, No. 06-8970, 2007 WL 186260 (U.S. Mar. 26, 2007). The "principal concern" in assessing defense counsel's performance, moreover, is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).

Second, the evidence that Nields contends his counsel should have discovered and presented was relatively weak mitigating evidence. To reiterate, Nields argues that "[i]f counsel had conducted a full investigation," he would have learned specifically that "Nields's childhood home life was chaotic and neglectful," that "he was an expert and dedicated musician whose life was once very focused," that "he had several successful employment experiences and was a hard worker," that "he did not drink while he was working," and that he "was a dependable, kind-hearted friend and an extremely helpful, friendly person." This additional evidence, moreover, is largely cumulative of what Pittman testified to at trial.

As this court has made clear, "the failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) (quotation marks omitted). "To establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Id.* (brackets omitted). The mitigating evidence that Nields contends his counsel should have investigated and presented falls far short of meeting this standard. In addition, several of the witnesses whom Nields contends should have been called were in fact on Nields's witness list, indicating that counsel's decision not to call them was, in fact, at least partly strategic.

## C.     Failure to retain an expert to testify to the causal relationship between Nields's alcoholism and his behavior on the night of the murder

In what we believe to be the closest of the five issues on appeal, Nields argues that his counsel was constitutionally deficient for failing to retain an expert to testify to the causal relationship, if any, between Nields's alcoholism and his behavior on the night of the murder. He further argues that this failure prejudiced him because the entirety of the defense at trial related to his alcoholism. In support of his argument, Nields submits postconviction affidavits from two doctors who concluded after reviewing the evidence in his case that Nields's alcoholism directly affected his behavior on the night that he killed Newsome.

### 1.     The Ohio Supreme Court's decision

The Ohio Supreme Court was the last state court to review this claim during postconviction proceedings. Because its review was on the merits, we again apply AEDPA deference. That court actually considered two arguments instead of the one before us on appeal: not only that Nields's counsel had been constitutionally deficient, but also that the trial court had rendered Nields's trial fundamentally unfair by "fail[ing] to appoint a neuropharmacologist, independent psychologist, and neuropsychologist." *Nields*, 752 N.E.2d at 874.

The Ohio Supreme Court summarily rejected this "failure-to-appoint" claim because, in light of Dr. Cooper's testimony, "counsel readily had alternative devices that would fulfill the same functions as the expert assistance sought." *Id.* (quotation marks omitted). Moreover, the trial court appointed every expert that Nields specifically requested; Nields's trial counsel simply "never suggested that they needed further assistance" from the additional experts cited during postconviction proceedings. *Id.* The Ohio Supreme Court also determined that because "the facts failed to reveal any need for a pathologist, psychologist, neuropsychologist, or pharmacologist[,] . . . no basis exists to find deficient performance" under *Strickland. Id.* at 892. In addition, Nields failed to demonstrate "that the lack of such experts caused an unfair trial." *Id.* at 874.

### 2.     The district court's review

The Report and Recommendation adopted by the district court agreed with the Ohio Supreme Court, emphasizing that Nields "offers no proof of what any other experts [beyond Dr. Cooper and Dr. Crates, the mitigation specialist] would have offered that would have affected the outcome of the case." Specifically regarding Nields's alleged need for an independent neuropharmacologist, the Report and Recommendation explained that although "[p]resent [habeas] counsel speculate that such a witness would have bolstered the alcoholism focus of the mitigation presentation, . . . such speculation is not evidence."

### 3.     Our review

We agree with the ultimate conclusion reached by both the Ohio Supreme Court and the district court, but offer a slightly different analysis. Notwithstanding the district court's

pronouncements to the contrary, Nields did "offer . . . proof of what any other experts would have offered." As noted above, Nields submitted the affidavits of two doctors, Kandiko and Ort. Each of those affidavits is lengthy and extraordinarily detailed, but their significance for the purpose of this appeal is rather straightforward: Both conclude, among other things, that Nields's intoxication played a major, even causal, role in his murder of Newsome. Kandiko, a Ph.D. in both pharmacology and physiology, opines that "alcohol contributed significantly to the inability of Mr. Nields to consider the ramifications of his actions against Ms. Newsome." Ort, a Ph.D. in psychology, similarly opines that "Richard's psychological make-up, in conjunction with his alcohol consumption, resulted in his aggressive response to a perceived threat on the night of the offense." (As we discuss further below, this "perceived threat" cited by Ort, like other statements in both her report and Kandiko's report, finds no corroboration anywhere in the record.)

Nields is correct in noting that not one of the witnesses who testified on his behalf spoke explicitly to the causal connection between his alcoholism and his murder of Newsome. But counsel did call two witnesses to testify specifically about Nields's alcoholism. First, Dr. Emmett Cooper, a psychiatrist and pharmacologist, "testified that [Nields] was an alcoholic and reviewed the medical ailments that [Nields] suffered as a result of his alcoholism. Dr. Cooper observed that [Nields's] time in jail since his arrest represented his longest period of sustained sobriety since 1976." *Nields*, 752 N.E.2d at 873. Cooper also testified to the impact of alcohol on Nields's life more generally, including the fact that his dependence had resulted in brain damage.

Second, James Slattery, a federal public defender and admitted alcoholic, "testified as to the deleterious effects of alcohol and how his alcoholism interfered with his ability to do what was best for himself as well as his ability to practice law." *Id.* Slattery's testimony therefore provided a personal example, if not a professional medical opinion, of the causal relationship that often exists between alcoholism and one's ability to function rationally. Pittman, Nields's sister, also testified about the effect of Nields's alcoholism on his life and how substance abuse generally affected the entire family.

The fact that none of the three mitigation witnesses addressed the alleged causal relationship between Nields's alcoholism and his conduct on the night of the murder more likely suggests that no such relationship existed than it proves that Nields's counsel was deficient in failing to elicit that information from them. In addition, counsel might well have—and, in fact, should have—chosen not to ask them the relevant question if he knew from having prepared the witnesses beforehand that none of them believed that such a causal relationship existed. Nields's counsel might not have been deficient at all, in other words, but rather quite strategic in his questioning.

At oral argument, Nields's appellate counsel attempted to denigrate Dr. Cooper's testimony by arguing that his expertise as a "psychopharmacologist" did not extend to the causal effects of alcohol. We respectfully disagree. Dr. Cooper was far from an unskilled novice in the area of alcoholism. He, like Dr. Kandiko, had a Ph.D. in pharmacology. And Dr. Cooper also operated a rehabilitation facility for recovering alcoholics.

And even if Nields's counsel had been deficient in not calling another expert, Nields would be hard pressed to demonstrate prejudice for the simple reason that neither of the two women at the bar to which Nields first went shortly after killing Newsome testified that Nields smelled of alcohol when he spoke of the murder. Dr. Cooper, moreover, acknowledged that Nields's awareness on the night of the murder of the fact that the police could not enter his home without a search warrant constituted evidence that he was "able to process rationally" at the time. Finally, as noted by the Ohio Court of Appeals, expert testimony regarding the alleged causal connection between Nields's alcoholism and his conduct on the night of the murder, even if presented, would have been irrelevant at least during the guilt phase of Nields's trial "because Ohio does not recognize a defense of

diminished capacity." *See State v. Nields*, No. C-990474, 2000 WL 1714176, at *2 (Ohio Ct. App. 2000).

If we were to consider Nields's new affidavits in isolation, then perhaps we would be more inclined to conclude that the additional proof might have made a difference in the outcome of Nields's trial. The "but for" test for prejudice under *Strickland*, however, does not permit us to simply substitute the testimony of Drs. Kandiko and Ort for that of Dr. Cooper and then reestimate the probable outcome. Instead, the test requires us to consider all of the testimony and related evidence together. We are not persuaded that Nields has demonstrated prejudice as measured against this broader, totality-of-the-evidence standard.

For two reasons largely unaddressed by Nields's counsel on appeal, we also doubt that Drs. Kandiko and Ort would have proven to be very effective witnesses. One reason is that the doctors relied on questionable evidence that was not in the trial record, and the other is that they failed to consider negative evidence that was in the record. Regarding evidence that was not in the record, Dr. Kandiko based his conclusion that "Nields . . . was under the influence of alcohol at the time of the argument, fight, and murder of Ms. Newsome" in large part on the following statements that even Kandiko recognized were dubious:

> Mr. Nields statement concerning his drinking on 3/27/97 were [sic] that he started drinking after 10:30 am with 2 pints of cheap "booze." He went to a bar between 1:00 and 2:00 pm, where he consumed between 10 and 15 drinks. This is *somewhat* confirmed in the trial transcript by someone, who saw Mr. Nields in the bar between 3:00 and 4:00 pm.

(Emphasis added.) Dr. Ort's subsequent analysis accepted Dr. Kandiko's conclusions as true. ("It is further my opinion that Dr. Kandiko offers a cogent explanation of the underlying mechanisms of alcohol abuse that contributed to that evening.")

Regarding negative evidence that was in the record, neither Dr. Kandinko nor Dr. Ort considered the significance of Nields's having warned the police on the night of the murder not to enter his house without a search warrant. They also failed to mention whether Nields's long history of alcoholism contributed to an increased level of tolerance. Dr. Cooper, as noted, considered both of these factors, concluding that because Nields's "tolerance was probably very high," his ability to "process rationally" at the time of the murder was not surprising. Accordingly, we are not persuaded that a reasonable probability exists that the outcome would have been different had Drs. Kandiko and/or Ort testified before the jury.

**D.      Failure to request a voir dire of the jurors after learning that several had seen Nields in handcuffs**

Nields next argues that his counsel was constitutionally ineffective for failing to request the opportunity to voir dire the jury after learning that several of the jurors had witnessed Nields in handcuffs as he was being transported back to the courtroom by two guards during his sentencing hearing.

### 1.      *The Ohio Supreme Court's decision*

The Ohio Supreme Court was the last state court to review this claim during postconviction proceedings. Because its review was on the merits, we apply AEDPA deference. Echoing the earlier ruling of the Ohio Court of Appeals, the Ohio Supreme Court determined that the "[d]efendant fails to demonstrate prejudicial error and simply asserts that he was prejudiced." *Nields*, 752 N.E.2d at 890; *see also Nields*, 2000 WL 1714176, at *2 ("Nields could not demonstrate prejudice where the jurors already knew from the testimony of a defense expert witness, Emmett

Cooper, M.D., that Nields had been incarcerated since the offenses, and that two deputies had been present in the courtroom throughout the trial."). The risk of prejudice, moreover, is "slight where a juror's view of a defendant in custody is brief, inadvertent, and outside the courtroom, as this apparently was." *Nields*, 752 N.E.2d at 890. Accordingly, counsel's decision not to request voir dire or a curative instruction on the matter, in the Ohio Supreme Court's opinion, constituted a "reasonable tactical choice[]." *Id.* at 893.

### 2.     *The district court's review*

The Report and Recommendation adopted by the district court clarified, but ultimately upheld, the Ohio courts' lack-of-prejudice determination. Specifically, the Report and Recommendation noted that although *Holbrook v. Flynn*, 475 U.S. 560 (1986), reiterated the basic principle that "a defendant may be prejudiced if he appears before the jury bound and gagged," *id.* at 568, the case "does not stand for the proposition that every fleeting observation by jurors of a criminal defendant in shackles during the transportation to or from court is so prejudicial as to require a *sua sponte* inquiry by the trial judge." This was so if for no other reason than that *Holbrook*, in the words of the magistrate judge, "upheld the state trial judge's deliberate decision to allow four uniformed state troopers to sit behind a criminal defendant at trial." Regarding Nields's case, the Report and Recommendation accordingly held that "[t]he Ohio Supreme Court's determination of lack of prejudice was . . . not an unreasonable application of clearly established Supreme Court law."

### 3.     *Our review*

We agree with the district court that the decision of the Ohio Supreme Court does not constitute an unreasonable application of clearly established federal law. Nields's counsel, to be sure, did not request to voir dire the jury or move for a mistrial. He did, however, immediately notify the trial court of the handcuffs-observation incident, and the court in turn promised that it would check with the court bailiff about the incident. Although the existence, content, and result of the trial court's conversation with the bailiff do not appear on the record, that very omission would appear to indicate a *lack* of prejudicial effect. Had the trial court determined otherwise, it presumably would have indicated that determination for the record, most likely in the form of a related jury instruction in open court.

We agree in any event with the Ohio courts that the exposure was nonprejudicial because of the fact that the jurors already knew that Nields had been convicted and incarcerated. The exposure, moreover, was "outside the courtroom and fleeting." Finally, as the warden notes, the very voir dire that Nields contends his counsel should have conducted might well have resulted in *more* prejudice, making a bigger-than-necessary deal out of a relatively inconsequential fact immediately before sentencing deliberations were to begin. Although we acknowledge the possibility that "the sight of shackles and gags *might* have a significant effect," *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (emphasis added), we simply cannot say that the Ohio courts were unreasonable in concluding that no such effect existed in this case.

## E.     Failure to introduce evidence of remorse

The final certified issue on appeal is whether Nields's counsel erred in failing to introduce Nields's taped confession to the police as well as a written report by one of the officers who transported Nields to jail on the night of the murder. Nields argues that these two pieces of evidence would have demonstrated to the jury his remorse for having killed Newsome. The failure to introduce them was especially egregious, Nields contends, because "[t]he State repeatedly told the jury that Nields was unremorseful and trial counsel stood silent."

### 1.      *The Ohio courts' review*

The Ohio Court of Appeals is the last state court to have explicitly reviewed this claim during postconviction proceedings.  In denying the claim, the court determined that

> [t]he . . . other documents presented by Nields, which indicated that Nields cried while he was being transported to jail, did not necessarily indicate remorse for the killing, as opposed to a fear of its consequences.  Furthermore, as the [Ohio] Supreme Court has stated, '[w]e . . . find that retrospective remorse is to be accorded little weight in mitigation of sentence.'

*Nields*, 2000 WL 1714176, at \*6 (quoting *State v. Post*, 513 N.E.2d 754, 768 (Ohio 1987)).

The Ohio Supreme Court subsequently reviewed elements of the claim—namely, whether counsel had been constitutionally ineffective in failing to introduce Nields's taped confession to the police—but did so without specific regard for evidence of Nields's remorse.  Addressing the first prong of the governing *Strickland* test, the Court determined that counsel's decision not to introduce the tape had been "a tactical one," and that counsel therefore had not been deficient in his representation of Nields.  *Nields*, 752 N.E.2d at 893.  It reasoned that, "[a]lthough defendant's display of erratic, intoxicated behavior could have swayed the jury towards a life sentence, the tape could have also alienated the jury and reinforced the perception that his crime merited the death penalty."  *Id.*  Accordingly, "[e]ven assuming defense counsel's tactics were questionable, we are unpersuaded that these trial tactics constituted ineffective assistance of counsel."  *Id.*

### 2.      *The district court's review*

The Report and Recommendation adopted by the district court did not specifically address the evidence of remorse complained of here, instead evaluating Nields's related, but broader, claim that his counsel was constitutionally ineffective in not investigating and presenting more mitigating evidence.  Regarding this larger claim, as noted earlier, the Report and Recommendation concluded that "the Ohio Supreme Court's decision on this claim is not an objectively unreasonable application of *Strickland v. Washington*."

### 3.      *Our review*

We are also unable to conclude that the decision of the Ohio Court of Appeals constitutes an unreasonable application of clearly established federal law.  As with Nields's first ineffective-assistance-of-counsel claim, the unintroduced evidence of remorse at issue in this final claim is cumulative.  *See Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) ("[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.") (quotation marks omitted).  Nields's counsel had already introduced evidence of Nields's remorse through the testimony of Timothy Griffis, a fellow inmate to whom Nields confessed murdering Newsome.  Griffis testified that Nields was remorseful at times when he recalled the events surrounding the murder.  The characterization of Nields's trial counsel as having "stood silent" while the prosecutor harped on Nields's remorselessness, accordingly, is inaccurate.

In addition, as the Ohio Court of Appeals explained, the evidence of remorse that Nields contends should have been introduced "did not necessarily indicate remorse for the killing, as opposed to a fear of its consequences." *Nields*, 2000 WL 1714176, at \*6.  The evidence would have shown, at most, that Nields cried *while being transported to jail*.  Neither piece of evidence, moreover, contains any actual statements from Nields that would otherwise indicate remorse.  To the contrary, "there [i]s more bad stuff than good stuff in there," as the government noted at oral

argument. Nields's taped confession, for example, includes his statement that "I guess I am a murderer. I killed her."

To be sure, as Nields argues, the opinion of the Ohio Court of Appeals is troubling in its citation to the Ohio Supreme Court for the proposition that "retrospective remorse is to be accorded little weight in mitigation of sentence." *Id.* Remorse, after all, is by definition "retrospective," although a valid distinction likely exists between pre-arrest remorse and post-arrest remorse. The amount of weight to be accorded certain types of mitigating evidence, moreover, is typically for the jury, not the judge, to decide. But neither of these criticisms, nor both, is sufficient to render the Ohio Court of Appeals's treatment of this issue "unreasonable" within the meaning of AEDPA. As the government notes in its brief, the Supreme Court in *Lockett v. Ohio*, 438 U.S. 586 (1978), established only that states may not limit the *type* of evidence presented at mitigation, not that states are prohibited from according little weight to certain types of evidence once presented.

## F.     Juror affidavits as proof of prejudice

In support of three of his four ineffective-assistance-of-counsel claims, Nields cites the affidavit of Jean Portman, a juror during both phases of his trial. Nields contends that Portman's affidavit alone suffices to establish the prejudice prong under *Strickland*—namely, that "there is a reasonable probability that at least one juror would have struck a different balance." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)). Specifically, Portman reviewed the evidence that defense counsel failed to introduce and concluded, as to each claim, that "it could have been significant mitigating evidence" (COA issue 2), "I would have given it considerable weight and effect . . . when I determined Mr. Nields' sentence" (COA issue 3), and "I would have placed considerable weight on this evidence as mitigation evidence" (COA issue 5).

The Ohio Court of Appeals never mentioned whether it had considered Portman's affidavit specifically, although Nields concedes and the record reflects that he submitted it with his appeal to that court. Instead, the court ambiguously noted that "the affidavit of a juror . . . failed to meet the minimal level of cogency." *Nields*, 2000 WL 1714176, at *5. The State argues that Ohio Rule of Evidence 606(b) also operated to bar consideration of the affidavit, even if the court did not explicitly say so. Rule 606(b) prohibits a juror from testifying, after the verdict, about "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith." Ohio R. Evid. 606(b). Although we do not believe that Rule 606(b) bars consideration of Portman's affidavit—which concerns exclusively post-deliberation, post-verdict evidence—we need not resolve that state-law question because we also do not believe that Portman's affidavit is sufficient to make the Ohio court's lack-of-prejudice determination an unreasonable application of clearly established federal law.

Crucially, Portman never says in her affidavit that she would have reached a different result if she had had the benefit of the unintroduced evidence at the time of sentencing. She instead simply notes that she would have given the evidence "considerable weight." Although we recognize that the governing test is not whether the jury "still [would] have decided on the death penalty," but whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Nields's] culpability," *Harries v. Bell*, 417 F.3d 631, 640 (6th Cir. 2005) (quoting *Wiggins*, 539 U.S. at 538), we cannot say that it was unreasonable for the Ohio courts to answer even that more forgiving question in the negative. More to the point, "the totality of available mitigating evidence" in this case pales in comparison to the "evidence in aggravation." *See Harries*, 417 F.3d at 639 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." (quoting *Wiggins*, 539 U.S. at 534)).

**G.      Death eligibility**

Despite the weakness of Nields's legal arguments on appeal, we cannot help but note that the circumstances of this case just barely get Nields over the death threshold under Ohio law. The "aggravating circumstance" that made Nields eligible for the death penalty was his having committed the murder "while . . . committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated robbery." Ohio Rev. Code § 2929.04(A)(7). But the evidence adduced at trial to support the dispositive "while . . . committing" element is far from obvious. In fact, beyond Nields's having driven Newsome's Cadillac, the only evidence supporting a robbery charge of any kind appears to have been Griffis's testimony that Nields had told him in jail two days after the murder "that he took money, jewelry, and traveler's checks out of Newsome's purse." *Nields*, 752 N.E.2d at 872.

But this latter evidence says nothing about *when* Nields took Newsome's personal items vis-à-vis the time of her death. Furthermore, the only evidence that Nields's theft of the Cadillac occurred prior to Newsome's death was the coroner's testimony that, based on the nature of Newsome's bruising and swelling, there would have been a "time lapse" of 15 minutes to 2 hours from the time Nields beat her up to the time that she actually died. This testimony raises the inference that if Newsome had been only unconscious and not dead during the time that Nields was at the bar, then his having taken her car during that period meant that an aggravated robbery was ongoing at the time he returned and "finished her off."

In any event, a death specification based on an inferential chain of events must still be consistent with the requirement that the death penalty be sparingly, and prudently, applied. *See Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution.") (quotation marks omitted); *see also Kansas v. Marsh*, 126 S. Ct. 2516, 2543 (2006) (Souter, J., dissenting) ("[W]ithin the category of capital crimes, the death penalty must be reserved for 'the worst of the worst.'"). At the same time, however, we recognize that a determination of whether this particular murder fits within that "narrow category" is a policy matter initially delegated by the state of Ohio to the jury and eventually delegated by the State to its governor to resolve in a fair-minded and even-handed manner.

## IV.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.